**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **WESLEY LEE EGGLESTON, II,** | : | |
| **209 Union Avenue** | : | **CIVIL ACTION** |
| **Coatesville, PA 19320,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **vs.** | : | |
| | : | **No.** |
| **TROOPERS JOHN/JANE DOES I-III,** | : | |
| *Individually and in their official capacities as* | : | |
| *members of the Pennsylvania State Police* | : | |
| **1800 Elmerton Avenue** | : | |
| **Harrisburg, PA 17110,** | : | |
| | : | **Jury Trial Demanded** |
| **FORMER PSP COMMISSIONER** | : | |
| **CHRISTOPHER PARIS,** | : | |
| *Individually and in his official capacity as* | : | |
| *the Former Commissioner of the Pennsylvania* | : | |
| *State Police* | : | |
| **1800 Elmerton Avenue** | : | |
| **Harrisburg, PA 17110,** | : | |
| | : | |
| **PSP JOHN/JANE DOE SUPERVISORS,** | : | |
| *Individually and in their official capacities as* | : | |
| *members of the Pennsylvania State Police* | : | |
| **1800 Elmerton Avenue** | : | |
| **Harrisburg, PA 17110,** | : | |
| | : | |
| **POLICE OFFICERS JOHN/JANE** | : | |
| **DOES IV-VI,** | : | |
| *Individually and in their official capacities as* | : | |
| *members of the Parkesburg Borough Police* | : | |
| *Department* | : | |
| **315 West First Avenue, Building 2** | : | |
| **Parkesburg, PA 19365,** | : | |
| | : | |

1

**MAYOR JOHN P. HAGAN, II,**      :
*Individually and in his official capacity as*      :
*Mayor of the Borough of Parkesburg*      :
**315 West First Avenue, Building 1**      :
**Parkesburg, PA 19365,**      :
     :
**CHIEF RYAN MURTAGH,**      :
*Individually and in his official capacity as*      :
*Chief of the Parkesburg Borough Police*      :
*Department*      :
**315 West First Avenue, Building 2**      :
**Parkesburg, PA 19365,**      :
     :
       **and**      :
     :
**BOROUGH OF PARKESBURG,**      :
**315 West First Avenue, Building 1**      :
**Parkesburg, PA 19365,**      :
     :
                  **Defendants.**      :

## COMPLAINT

NOW COMES, the Plaintiff, WESLEY LEE EGGLESTON, II, by and through his legal counsel, Robert E. Goldman, Esquire and Gerard P. Egan, Esquire, and do hereby allege and aver the following:

## I. JURISDICTION AND VENUE

1.      This action is instituted under the United States Constitution, particularly under the provisions of the Fourth and Fourteenth Amendments, and under federal law, particularly the Civil Rights Act of 1871 (hereinafter referred to as the "Act,") <u>as amended</u>, 42 U.S.C. §§ 1983 and 1988.

2.     This Court has jurisdiction in this matter pursuant to 28 U.S.C. § 1331, §

1343(a)(3), § 1343(a)(4) and § 1367(a), regarding the principles of pendent

and supplemental jurisdiction over related state law claims.

3.     Venue in the Eastern District of Pennsylvania is properly laid pursuant to

28 U.S.C. § 1391, insofar as the alleged actionable conduct complained of

in this Complaint, which forms the factual and legal basis of the Plaintiff's

claims, arose within the geographical limits of this District in general and

within the geographical limits of Parkesburg Borough, Chester County,

Pennsylvania, in particular.

## II.    PARTIES

4.     Plaintiff, Wesley Lee Eggleston, II (hereinafter referred to as "Plaintiff" or

"Eggleston"), is an adult individual, who currently resides at 209 Union

Avenue, Coatesville, Chester County, Pennsylvania 19320.  He was at all

relevant times hereto, a citizen of the Commonwealth of Pennsylvania.

### THE PENNSYLVANIA STATE POLICE DEFENDANTS

5.     Trooper Defendant(s) John/Jane Does I-III (hereinafter referred to as

"Doe" or "Does") are adult individual(s) whose identity is presently

unknown and, at all times relevant hereto, was/were a member of the

Pennsylvania State Police (hereinafter "PSP") and a Trooper assigned to a

PSP Troop that included Parkesburg Borough, Chester County,

Pennsylvania, and was entrusted with the power, under color of law, to enforce the laws of the Commonwealth of Pennsylvania, and to protect the Constitutional rights of those he/she/they encountered.

6.  Defendant Former Colonel Christopher Paris (hereinafter "Paris" or "the Commissioner" or "the Policymaker") is an adult individual who, at all times relevant hereto, was a sworn member of the PSP.  Paris held the rank of Commissioner at the time of the incident that is the subject of this Complaint.  Between 2020 and 2022 Paris' rank was Lieutenant Colonel which is the second in command of the PSP and was Deputy Commissioner of Administration and Professional Responsibility, assisting the Commissioner run the PSP.  His responsibilities included training and education; internal affairs; and discipline.  In 2022, pursuant to Paris' own request, he reverted to PSP Major – Commander of Area III. His responsibilities as Major included commanding an area of the Commonwealth and its State Police troops; supervising the work of subordinate PSP Captains; commanding State Police programs or functions; and developing and implementing agency policies.  On January 19, 2023 Paris was appointed Acting Commissioner of the PSP.  On March 9, 2023 Paris was confirmed as the official Commissioner of the Pennsylvania State Police.  At various times pertinent to this Complaint,

Paris was responsible for overseeing the training of troop members, the formulation and/or implementation of practices, policies, and procedures, discipline and assignment of Troopers and officers, hiring and firing, as well as the day to day operation and overseeing and command and control of all segments of the PSP, and who at all times relevant hereto was acting within the scope of his duties and authority, under color or title of state or municipal public law or ordinance and supervised or controlled one or more of the other Defendants herein in their conduct or actions, or acted in concert with them in the performance of their conduct or actions, or acted independently.  It is believed, and therefore averred that Paris, as of January 19, 2023, was the ultimate authority for the training, staffing, promotions, discipline and/or operational functions of the PSP, with the final and unreviewable decision-making authority of policymaker.

7.  Defendants John/Jane Doe Supervisors (hereinafter "PSP Supervisory Defendants") are adult members of the PSP whose identity is presently unknown, and at all times pertinent to the claims asserted herein, were responsible, *inter alia*, for the training and direct supervision of Defendant Trooper John/Jane Does I-III, and other subordinates.

8.  Paris and Supervisory Defendants, were supervisors within the context of 42 U.S.C. § 1983 because each of them was personally involved with

policy determinations, monitoring and enforcement of, among other things, training, defining performance by practice and/or promulgating rules or otherwise, by monitoring adherence to performance standards, and by responding to unacceptable performance whether through individualized discipline or further rule making.

9.    To the extent that discovery reveals that any one of the foregoing Supervisory Defendants lawfully designated another person or persons to act as their designee(s), the allegations of supervisory liability made herein are intended to and do expressly also apply to said designee.

10.    At all places where reference to the Pennsylvania State Police is made hereinafter, "PSP" may be used, including reference to all Pennsylvania State Police Defendants collectively as, the "PSP Defendants."

11.    The PSP Defendants are sued in their individual capacities pursuant to 42 U.S.C. § 1983 ("Section 1983"), for their actions, all of which occurred under color of law and, accordingly, neither 11th Amendment immunity, nor sovereign immunity applies.

12.    Relative to the pendent state claims asserted, the PSP Defendants' acts and omissions are alleged to have been committed outside the scope of their employment, and therefore are not subject to sovereign (state legislated immunity, 1 Pa. C.S.A. § 2310), immunity.  The injunctive relief sought

against these Defendants is sought in their official capacities for which they are likewise not immunized.

## **THE PARKESBURG BOROUGH DEFENDANTS**

13.   Police Officers Defendant(s) John/Jane Does IV-VI (hereinafter referred to as "Doe" or "Does") are adult individual(s) whose identity is presently unknown and, at all times relevant hereto, was/were serving in his/her/their capacity as a sworn officer(s) of the Parkesburg Borough Police Department, and was/were entrusted with the power to enforce the laws of the Commonwealth of Pennsylvania and the Ordinances of the Borough of Parkesburg.  Defendant(s) Does IV-VI was/were entrusted to protect the Constitutional rights of those he/she/they encountered, and at all times relevant hereto, was/were acting under the authority and color of law, and in concert with one or more of the other individual Defendants in the performance or conduct of their actions, or acted independently of them.

14.   Defendant Mayor John P. Hagan, II, (hereinafter referred to as "Mayor" or "Mayor Hagan") is an adult individual who is an elected official of the Borough of Parkesburg and is in direct supervision of the Police Department and its sworn members, and also of the selection of supervisory personnel for the Parkesburg Borough Police Department, who are, in turn, by and through him, responsible for the formulation

and/or implementation of practices, policies, customs and procedures, as well as the day-to-day operation and oversight, including command and control, of all segments of the Parkesburg Borough Police Department. Mayor Hagan either does, or has failed to, promulgate and enforce laws, rules and regulations concerning the operations of the Parkesburg Borough Police Department and who at all times relevant hereto, was acting within the scope of his duties and authority, under color or title of state or municipal public law or ordinance, and supervised or controlled one or more of the other Defendants herein, in their conduct or actions, or inactions, or acted in concert with them, in the performance of their conduct or actions.  It is believed, and therefore averred that Defendant Mayor Hagan, exercises/exercised authority over the selection, staffing, retention, training, promotions, discipline and operational functions of the Parkesburg Borough Police Department, with the final and unreviewable decision-making authority of a policymaker.

15.    Defendant Chief Ryan Murtagh (hereinafter referred to as "Chief" or "Chief Murtagh") is an adult individual who is a sworn member of the Parkesburg Borough Police Department with the rank of Chief who is responsible, by delegation or otherwise, for the formulation and/or implementation of practices, policies, and procedures, discipline and

assignment of officers, hiring and firing, as well as the day to day operation and overseeing and command and control of all segments of the Police Department, and who at all times relevant hereto, was acting within the scope of his duties and authority, under color or title of state or municipal public law or ordinance and supervised or controlled one or more of the other Defendants herein in their conduct or actions, or acted in concert with them in the performance of their conduct or actions, or acted independently.  It is believed, and therefore averred that Chief Murtagh, along with Mayor Hagan, at pertinent times, were the ultimate authorities for the staffing, promotions, discipline and/or operational functions of the Parkesburg Borough Police Department, with the final and unreviewable decision-making authority of policymakers.

16. Defendant Borough of Parkesburg (hereinafter referred to as "Borough" or "Parkesburg Borough") is a governmental entity within the Commonwealth of Pennsylvania, empowered to establish, regulate, and control its Police Department for the enforcement of laws and ordinances within its jurisdiction, and for the purpose of protecting and preserving the persons, property and the Constitutional rights of individuals within the geographical and legal jurisdiction of the Defendant Borough of Parkesburg.

17.    At all places where reference to the Parkesburg Police is made hereinafter, "Parkesburg" may be used, including reference to all Parkesburg Defendants collectively as, the "Parkesburg Defendants."

18.    The Parkesburg Defendants are sued in their individual capacities pursuant to 42 U.S.C. § 1983 ("Section 1983"), for their actions, all of which occurred under color of law and, accordingly, neither 11th Amendment immunity, nor sovereign immunity applies.

19.    Relative to the pendent state claims asserted, the Parkesburg Defendants' acts and omissions are alleged to have been committed outside the scope of their employment, and therefore are not subject to sovereign (state legislated immunity, 1 Pa. C.S.A. § 2310), immunity.  The injunctive relief sought against the Parkesburg Defendants is sought in their official capacities for which they are likewise not immunized.

## ALL DEFENDANT PARTIES

20.    The acts and/or omissions of the Defendants, or one or more of them, evidenced a deliberate indifference to the rights guaranteed to individuals such as Plaintiff, under the Fourth and Fourteenth Amendments to the United States Constitution, and Pennsylvania Constitution.

21.    At all times relevant, the legal principles regarding the rights of persons, such as Plaintiff, and the contours of those Constitutional and statutory

rights, were well-established, and it was not reasonable for any Defendant to believe that his/her actions, as complained of herein, would not deprive the Plaintiff of those rights.

22.   At all times during the events described herein, the Defendants were engaged in one or more joint ventures which combined to produce the Constitutional violations and other harms asserted herein.  The Defendants assisted each other in performing the various actions described, and lent their physical presence, support and/or authority to one another.

23.   The Plaintiff further believes and therefore avers, that without the intervention of this Honorable Court, the Plaintiff, as well as others, may suffer from state and federal rights violations similarly and that, consequently, injunctive relief is demanded, and required.

24.   The Defendants, individually and collectively, at all times pertinent to the claims asserted herein, acted under color of law.

25.   While acting under color of law, the Defendants deprived the Plaintiff of various state and federal Constitutional rights as more fully set forth herein.

26.   Relative to the pendent state claims asserted, the Defendants' acts and omissions are alleged to have been committed outside the scope of their employment, and therefore are not subject to sovereign (state legislated

immunity, 1 Pa. C.S.A. § 2310), immunity.  The injunctive relief sought against these Defendants is sought in their official capacities for which they are likewise not immunized.

## III.    PRE-DISCOVERY FACTUAL ALLEGATIONS

27.    The following factual allegations are made upon the Plaintiff's knowledge, information and belief, prior to conducting authorized discovery for information which is primarily in the exclusive possession of one or more of the Defendants.

28.    Eggleston was engaged in his own business of providing transportation to clients in his personal vehicle.

29.    On January 31, 2024, at approximately 10:28 a.m., Eggleston drove to 710 First Avenue, Parkesburg, PA pursuant to a requested appointment for transportation by a home health care worker who provided health services to the infirm and elderly.  The health care worker had requested a 10:30 a.m. transport to her residence.

30.    Eggleston legally parked in front of the residence, as he had done on numerous prior occasions, and was stationary while waiting for his client to exit the residence.

31.    Eggleston, an African-American, while sitting in his vehicle, was on his phone speaking to his father when he noticed approximately four white law enforcement officers in uniform up the street.

32.    Two of the officers came towards his vehicle and stared at him, appearing hostile and aggressive to him.

33.    As the officers continued to stare at Eggleston, he rolled down his window to ask whether there was a problem and immediately one of the officers asked him for his name and he calmly responded, "my name is Wesley."

34.    Without any explanation, at least one of the four officers began yelling at Eggleston to get out of his vehicle and Eggleston calmly asked why he was being ordered to exit his vehicle.

35.    Eggleston, who committed no wrong at all and committed no traffic violations, did not understand why he would have to exit his vehicle and feared for her safety.

36.    Other officers joined in the chant to get out of his car, while Eggleston repeatedly asked what he had done and why he was being detained.

37.    Eggleston told the police he was afraid and did not understand why he was being detained.

38.    The officers then questioned why Eggleston was at that location.  He explained that he was a businessman, that he owned his own business, and

that he was there to pick up his client for a scheduled 10:30 a.m. transport from the very house in front of where he was parked.

39.    The officers made no effort to approach the residence to confirm Eggleston's statement.

40.    The officers never asked Eggleston for his photo driver's license or vehicle registration.

41.    The officers never used their vehicle computers to pull up a picture of Eggleston's driver's license.

42.    Instead, one officer told Eggleston that he was being detained but refused to explain why.  No crime, no traffic violation, and no suspicious activity was ever articulated to him.

43.    While Eggleston was attempting to text his client to let her know that he had arrived for her ride, the officers opened his car door without consent. As he was still seated in the vehicle, multiple officers began trying to forcibly pull him out of the car.

44.    At that moment, one officer pointed what appeared to Eggleston to be a firearm directly at his chest and Eggleston feared for his life.

45.    Another officer then jumped onto Eggleston's neck and began choking him.  In shock and fear, Eggleston attempted to comply and exit the vehicle.

46.    Pulled out of his vehicle, the officers tried to force him to the concrete and shot him in his lower back with a taser, sending painful electrical current through his body.

47.    Reacting to the extreme pain, Eggleston reached behind him attempting to pull the taser wire from his body.  When he grabbed the wire, his hand immediately clamped shut due to the electrical current, and he was unable to release it.  This caused additional and extreme pain throughout his body.

48.    The officers then handcuffed him and while he was restrained and on the ground, an officer who was on top of him punched him in the mouth.  He then drove his knee into his neck with such force that he could not breathe.  While restrained, the officer scraped his face against the hard cement.

49.    All Defendant John/Jane Doe troopers/officers at the scene of the incident were in close proximity of the assault on Eggleston and took no effort to intervene in the actions of those using excessive force upon Eggleston and his unlawful seizure.

50.    Throughout the entire encounter and assault, Eggleston repeatedly told the officers that he had done nothing wrong and that he did not understand why this was happening to him.

51.    After some time, the officers realized that he was an innocent victim of their attack.  At that point, they disengaged and stood up.  Only then did

they ask him whether he had identification. While still handcuffed and lying on the sidewalk, he informed them that he did have identification. After removing the handcuffs, Eggleston provided his driver's license to them.

52.    Eggleston observed that the officers who seized and used excessive force on an innocent man, included at least three Pennsylvania State Police Troopers and one Parkesburg police officer.

53.    When a supervisory law enforcement officer arrived after the attack, he dismissively attempted to justify the attack and convince Eggleston that he had tried to flee, despite the fact that his vehicle had never moved and remained parked in the same location where it had been since his arrival to pick up his client.

54.    Eggleston's client then came outside the residence and informed the officers that he, in fact, had been there to pick her up, confirming everything Eggleston had told the police from the beginning.

55.    Despite a request, the Parkesburg Police Department and the PSP refused to identify the officers/troopers involved in the incident and assault.

56.    As a direct and proximate result of the said acts or omissions of the Defendant Does, made possible by, and compounded by, the acts and/or omissions of other Defendants, the Plaintiff as indicated above, and as may

16

be detailed further hereinafter, was caused to suffer, *inter alia,* the following injuries and damages, some or all of which may be continuing and/or permanent in nature:

    i.  physical and mental pain and suffering, in both the past and the predictable future, including discomfort, loss of use of bodily function, ill health, loss of sleep, and other emotional injuries including stigma, scarring, humiliation, distress, fright, PTSD, and emotional trauma;

    ii.  medical and psychological expenses, past and future;

   iii.  physical debilitation;

   iv.  loss of life's pleasures;

    v.  general damages for violation of Eggleston's Constitutional rights under the Fourth and Fourteenth Amendments to the United States Constitution and Article 1, Section 8 of the Pennsylvania Constitution;

   vi.  loss of income, past and future and shortening of economic horizons;

  vii.  punitive damages (except as to the Borough and the Defendants in their official capacities), which are justified factually as alleged herein, and legally, because the Defendants acted maliciously and/or

wantonly in violating Eggleston's Constitutionally (federal and state) protected rights, and intentionally, recklessly and willfully engaged in reprehensible and outrageous conduct not to be tolerated in a civilized society; and

viii.   such legal fees and costs as may be recoverable under the law.

57.   The PSP and the Parkesburg Borough Police Internal Affairs Division ("IA"), and/or Office of Professional Standards ("OPS"), and/or a similar department, which are responsible to investigate all use of force incidents by their law enforcement, did not conduct a thorough and objective investigation into the assault upon Eggleston, or even any investigation at all, even after a video of the assault from a neighbor's residence was known to exist.

58.   PSP and Parkesburg engaged in no investigation at all, and if any was conducted, it was only a superficial, pro forma investigation, and a cover-up.

59.   Equally telling is the fact that, of the numerous investigations which were supposedly conducted into Troopers and Parkesburg police officers' excessive force and seizure misconduct over the last several years, it is believed and therefore averred that <u>none</u> were internally determined to be

founded, when some, at least, clearly warranted disciplinary action, termination, and/or retraining, and no such action resulted.

60.   In fact, PSP and Parkesburg have a history of not disciplining or terminating even the most egregious Troopers and officers, allowing these violators to resign and keep their pensions, with no action taken against these individuals.

61.   No discipline of any kind was imposed upon the instant Defendants, nor any other of the PSP and Parkesburg personnel that assisted in covering up the clearly unconstitutional conduct committed against Eggleston.

62.   In sum, no appropriate investigation was undertaken, no discipline was issued, and no retraining was ordered, by Commissioner Paris, Mayor Hagan, Chief of Police Murtagh, or any supervisor, despite the clear Constitutional violations committed by the Defendant Trooper/Officers against the Plaintiff.

63.   This lack of an appropriate, independent and objective investigation and lack of any subsequent discipline or corrective action, is a long-standing practice and custom of PSP and Parkesburg, and further evidences that supervisors and decision-makers such as Paris, Mayor Hagan, and Chief Murtagh were not only deliberately indifferent to violations of citizens' Constitutional rights, but actually condoned, if not encouraged, same, and,

that, that acquiescence had become a custom or *de facto* policy within their law enforcement entities.

64.  The PSP and Parkesburg Borough provided inadequate training and performance testing, to its troopers/officers (and no remedial training to the Defendants) pertaining to the appropriate use of force to employ in circumstances such as those presented *sub judice*; or regarding the appropriate action to take when seeking to approach and make inquiry of a driver of a motor vehicle, or the importance of undertaking independent, thorough, accurate and objective investigations, or of rendering truthful, independent and complete reports, when called upon to do so.

65.  Upon information and belief, members of the PSP and Parkesburg Police Department generally, and routinely, used excessive force in the performance of their duties, and no disciplinary action was taken in any of those instances.

66.  Prior to the incident giving rise to Eggleston's Complaint, any written policies that may have existed regarding the appropriate use of force to be utilized in circumstances akin to those encountered here, and commonly encountered by law enforcement, were routinely ignored and this abuse was accepted as the common practice and custom within the PSP and Parkesburg Police Department.

67.   Despite repeated incidents/complaints of excessive use of force committed by PSP troopers and Parkesburg Police Officers, regardless of the instrument of force utilized, no significant efforts were made to establish or ensure actual proper use of force standards were promulgated, disseminated and enforced.  No efforts were made to ensure citizens' Constitutional rights were not violated.  And, no discipline or remedial training was implemented when such abuses occurred in the past.

68.   The Internal Affairs division and other investigative arms of the PSP and Parkesburg Police routinely operated, not to make legitimate inquiry into police wrongdoing, but as a vehicle to cover-up, falsely justify, defend from litigation, and otherwise exonerate police misconduct, thereby ensuring its perpetuation.

69.   This custom and *de facto* policy supported an ongoing culture which not only condoned, but encouraged, the sort of constitutional violations which occurred here, with each Defendant knowing that his conduct would go unpunished and undeterred.

70.   At all times relevant hereto, the legal principles regarding the rights of persons, such as the Plaintiff, to be free from the excessive use of force by a police officer, to be free from unlawful seizure, to the due process of law, as well as the contours of those Constitutional and statutory rights, were

well established, and it was not reasonable for the Defendants to believe that their actions would not deprive the Plaintiff of those rights.

71.    The actions of the Defendants violated the clearly established and well-settled federal Constitutional rights of Plaintiff as more clearly set forth in the Counts below.

72.    The Plaintiff did not physically resist, threaten, or assault the Defendant troopers/officers in any way, and the force used against the Plaintiff was totally and completely unnecessary, unreasonable, excessive and outrageous, warranting the award of both compensatory and punitive damages against the Defendant John/Jane Does, and against the Defendant troopers/officers who intentionally covered-up law enforcement outrageous actions.

73.    PSP and Parkesburg Borough, acting through their policy makers, and supervisors, also routinely ignored citizens' complaints of officers' violations of citizens' Constitutional rights.    In effect, it was communicated to their respective law enforcement entities, and the public, that any attempt to reform the entities would be ineffectual and that the custom and practice of inflicting Constitutional abuses by members of its law enforcement entities would remain intact.

74.  The PSP and Parkesburg Borough Police Department and the Borough of Parkesburg, intentionally, and with deliberate indifference, discourage complaints, do the absolute minimum investigation, including, *inter alia*, refraining from interviewing key witnesses, neglecting to obtain and review video surveillance, and, instead, actively assist in creating a story to justify the troopers/officers' violations.

75.  In effect, the PSP and Parkesburg Borough Police Department and the Borough of Parkesburg, acting through its policy-makers and supervisors, have institutionalized a policy to cover-up police wrongdoing, or at the very least to turn a blind eye toward the wrongdoing, sending a message to both the Department and the public at large, that Constitutional violations will not only go unpunished but will be tolerated, if not encouraged by the PSP, the Borough and the police administration.

76.  This constitutes deliberate indifference *per se* and a complete abdication of supervisory and decision-making responsibility.

77.  Commissioner Paris, Parkesburg's Mayor, the Parkesburg Police Department, and Chief Murtagh, among other decision makers and supervisors, failed to adopt and enforce reasonable and necessary policies and procedures to end the culture of abuse and of deliberate indifference to the rights and safety of citizens that had become the long-standing

hallmark of their police agencies. The Defendants herein continued to encourage this custom and practice of deliberate indifference to the Constitutional rights of others by ignoring and even rewarding inappropriate actions, by failing to promulgate appropriate rules, regulations and policies; by failing to enforce existing rules and regulations; by failing to discipline; by inappropriate hiring, training, supervision and promotional practices; and by reinforcing the old culture of deliberate indifference, especially in the face of continued and blatant unconstitutional and policy-violative acts.

78.    At all times during the events described above, the Defendant Trooper/Officers were engaged in a joint venture. These individual Defendants assisted each other in performing the various actions described, and lent their physical presence, support and/or the authority of their office to each other during the sham investigation of the subject use of excessive force.

79.    The actions of the Defendants violated the clearly established and well-settled Federal Constitutional rights of Eggleston and, it would be unreasonable for any Defendant to believe that they were not violating such rights as more clearly set forth in the Counts below.

80.  Eggleston believes, and thus avers, that without the intervention of this Honorable Court, Eggleston in particular, as well as others, is likely to suffer damages from similar Constitutional violations in the future, requiring injunctive relief.

81.  Defendant Does' conduct violated numerous provisions of the PSP and Parkesburg Borough Police Department's own Policy Manuals containing General Orders and Directives by which troopers/officers are bound to conduct themselves as sworn law enforcement officers.

82.  The Defendants, individually and collectively, at all times pertinent to the claims asserted herein, acted under color of state law.

83.  While acting under color of state law, the Defendants deprived Eggleston of various state and federal Constitutional rights as more fully set forth herein.

## COUNT I
### 42 U.S.C. § 1983
### Excessive Force
### *Against All Individual Defendant Does*

84.  The preceding paragraphs are incorporated herein by reference as though fully set forth.

85.  The Plaintiff was subjected to a seizure within the meaning of the Fourth Amendment through the application of force.

86.   The application of force against the Plaintiff was unreasonable under the circumstances and unconstitutionally excessive.

87.   The Fourth Amendment to the United States Constitution protects persons from being subjected to excessive force, even while being arrested and, even if the arrest is otherwise proper.

88.   Defendant Does used excessive force in their interaction with Plaintiff in that there was absolutely no need for the application of any force, and in view of the fact that the amount of force actually used by Defendant Does exceeded the amount of force which a reasonable officer would have used under similar circumstances, and force of a kind which violated the PSP and Parkesburg Borough Police Department's own policies, deficient as they may otherwise be.

89.   Accordingly, no physical force of any kind was required or should have been employed against the Plaintiff here.

90.   The Plaintiff did not present any threat to the Defendants nor any other persons or property at the time he was seized and assaulted.

91.   The Defendants used excessive force in their encounter with the Plaintiff as described hereinbefore.

92.   The use of force was not reasonable under the Constitution where, as here, there was no need for any force at all, especially the force that was used.

93. The nature and degree of excessiveness utilized against the Plaintiff by Defendants was, under the circumstances presented here, outrageous, reprehensible, malicious, vicious, intentional, willful and malevolent, and clearly warrants an award of both punitive and compensatory damages.

94. As a direct and proximate result of the excessive use of force employed against the Plaintiff in violation of his Fourth Amendment rights, the Plaintiff suffered damages as stated herein.

95. Defendants are liable for their personal involvement in the commission of the acts complained of here.

96. Defendant Supervisors and Policymakers are liable for the acts of Defendants pursuant to the claims of Supervisory and Policymaker liability, expressly set forth herein, and which are incorporated by reference as if set forth *et extenso* here.

97. The likelihood is that, but for the alleged acts and omissions committed by the Defendants, the injuries inflicted upon the Plaintiff would not have occurred.

**WHEREFORE,** Plaintiff respectfully requests that this Honorable Court award judgment in Plaintiff's favor and against the aforesaid Defendant Does, jointly and severally with other Defendants, in an amount in excess of the One Hundred Fifty Thousand Dollar ($150,000.00) limit for arbitration in the Federal District

Court for the Eastern District of Pennsylvania, together with punitive damages against the Defendants in their individual capacity, injunctive relief, attorneys' fees and costs, and such other relief which the Court may find appropriate.

**<u>COUNT II</u>**
**42 U.S.C. § 1983**
**Unlawful Seizure**
***Against All Individual Defendant Does***

98.    The preceding paragraphs are incorporated herein by reference as though fully set forth.

99.    The conduct of Defendant Does constituted an unlawful seizure of the Plaintiff, within the meaning of the Fourth Amendment, in that he experienced, *inter alia*, an unreasonable deprivation of his freedom of movement at the hands of a state actor.

100.    Said seizure was unreasonable and without probable cause in that the facts and circumstances available to the Defendants would not warrant a prudent officer in believing that the Plaintiff had committed or was committing a crime, which would justify his seizure.

101.    The Plaintiff was subjected to the unlawful seizure in violation of the Fourth Amendment of the United States Constitution.

102.    As a result of the unlawful seizure affected upon the Plaintiff, and the vicious manner in which it was effected, the Plaintiff suffered damages as stated herein.

103.   Defendant Does are personally liable for their direct involvement in the commission of the acts complained of herein.

104.   Defendant Does' conduct was intentional, willful, malicious, wanton and committed with a reckless disregard for the rights of the Plaintiff, constituting reprehensible conduct not to be tolerated in a civilized society, subjecting him not only to the imposition of compensatory damages as claimed herein, but also to punitive/exemplary damages.

105.   PSP Commissioner Paris and the Supervisory PSP Does are liable for the acts of all PSP Trooper Defendants pursuant to the claims and theories expressly set forth hereinafter, and which are incorporated by reference as if set forth *et extenso* here.

106.   Parkesburg Borough, its Mayor, and Chief are liable for the acts of all Parkesburg Police Officer Defendants pursuant to the claims and theories expressly set forth hereinafter, and which are incorporated by reference as if set forth *et extenso* here.

107.   Further, the conduct exhibited by Defendants as subordinate state and municipal officers and employees, which occurred on January 31, 2024, was not unexpected.  Neither was it the deed of an independent, non-supervisory actor.  But, rather, it constituted predictable behavior of subordinates who operated with perceived impunity due to the deliberate

indifference of their Supervisors and Policymakers, and their joint policies, practices and customs, which operated as the moving force behind what Defendant Does believed to be their unaccountable effort to engage in what had become, all too customary, Constitutional deprivations within the PSP and Parkesburg Borough Police Department.

108. The PSP and Parkesburg Borough Police Department has a custom and practice of failing to hold its Troopers and Officers accountable for their misconduct and violation of Constitutional rights.

109. The likelihood is that, but for the alleged acts and omissions committed by PSP Commissioner Paris and his supervisors, the Parkesburg Borough, and its Chief, the injuries inflicted upon the Plaintiff would not have occurred.

**WHEREFORE,** Plaintiff respectfully requests that this Honorable Court award judgment in Plaintiff's favor and against the aforesaid Defendants, jointly and severally, in an amount in excess of the One Hundred Fifty Thousand Dollar ($150,000.00) limit for arbitration in the Federal District Court for the Eastern District of Pennsylvania, together with punitive damages against the Defendants in their individual capacity, injunctive relief, attorneys' fees and costs, and such other relief which the Court may find appropriate.

## COUNT III
### 42 U.S.C. § 1983
### Failure to Intervene
### *Against All Individual Defendant Does*

110. The preceding paragraphs are incorporated herein by reference as though fully set forth.

111. Each of the Trooper and Police Officer Defendants are liable for failing to intervene to prevent the assault upon Plaintiff and the statutory and Constitutional violations of Plaintiff's federally protected rights, at the hands of another Defendant.

112. Plaintiff's Constitutional rights were violated as alleged herein.

113. Under the aforestated circumstances, whether Defendants were or were not themselves violating Plaintiff's rights, they had the duty to intervene, including the duty to intervene to prevent the use of excessive force by the other Defendants upon Plaintiff, since they had a reasonable opportunity to do so.

114. Defendants had a realistic and reasonable opportunity to intervene.

115. Defendants failed to intervene.

116. Accordingly, Defendants are jointly and severally liable for all the harm, and hence damages, suffered by the Plaintiff, as stated herein.

117. The likelihood is that, but for the alleged acts and omissions committed by one of the Defendants, the injuries inflicted upon the Plaintiff by other Defendants would not have occurred.

118. Defendants are jointly liable for their personal involvement or lack of in the commission of the acts complained of here, and/or their failure to act.

119. Defendant Supervisors and Policymakers are liable for the acts of Defendants pursuant to the claims of Supervisory and Policymaker liability, expressly set forth herein, and which are incorporated by reference as if set forth *et extenso* here.

120. Defendant, the Borough of Parkesburg, is liable for the failure to intervene by Defendant Parkesburg Does pursuant to the claims of Municipal (*Monell*) Liability, expressly set forth herein, and incorporated by reference as if set forth *et extenso* here.

**WHEREFORE,** Plaintiff respectfully requests that this Honorable Court award judgment in Plaintiff's favor and against the aforesaid Defendants, jointly and severally, in an amount in excess of the One Hundred Fifty Thousand Dollar ($150,000.00) limit for arbitration in the Federal District Court for the Eastern District of Pennsylvania, together with punitive damages against Defendants in their individual capacities, injunctive relief, attorneys' fees and costs, and such other relief which the Court may find appropriate.

## COUNT IV
### 42 U.S.C. § 1983
### Civil Conspiracy
### *Against All Individual Defendant Does*

121. The preceding paragraphs are incorporated herein by reference as though fully set forth.

122. The referenced Defendants participated in a conspiracy to violate the Plaintiff's Constitutional rights.

123. Direct evidence of conspiracy is rarely available and therefore, the existence of a conspiracy must usually be inferred from the circumstances.

124. Those circumstances establishing a conspiracy here are very compelling:

    a. the Defendant Does were present and, in combination, jointly committed an unconstitutional assault upon the Plaintiff and not one of them cautioned, restrained or prevented the other from engaging in this wrongdoing, even though the opportunity clearly existed to do so, and even though the obligation to do so also existed; and

    b. the Defendant Does acted fully in concert – one with the other, obviously demonstrating the common plan, scheme or design that they agreed upon, and a meeting of the minds when the assault occurred.

125. Plaintiff believes and therefore avers that Defendants also acted in accord with the long-standing custom and practices of the PSP and the Parkesburg

Borough Police Department, which attempted to ensure that information was not reviewed, nor considered, during any use of force review by any team, the assigned investigator, the supervisor, the chain of command, the Office of Professional Services, nor any final decision-maker, in this case.

126. This all constitutes clear evidence of a civil conspiracy engaged in by the Defendant Does (those co-conspirators who are presently unidentified), who agreed to, and did, conceal independent evidence of the Plaintiff's victimhood and the Defendant Does' wrong-doing in this case.

127. Each one of the foregoing intentional acts and/or intentional omissions, evidences a meeting of the minds and an understanding between the Defendant Does, which has as its successful object, the deprivation of the Constitutionally protected rights of the Plaintiff.

128. It is also clear from the foregoing that the Defendants, and each of them together:

    a. engaged in a single plan, the essential nature and general scope of which was known by them;

    b. executed that plan in a coordinated way and by a common design which had as its probable and nature consequence the violation of Plaintiff's Constitutional rights as set forth herein;

    c.  acted in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which was an agreement between them to inflict continuing Constitutional wrongs against, or injury upon, the Plaintiff as more fully set forth herein; and

    d.  as a direct and proximate result of the foregoing, and the overt acts described hereinbefore, Plaintiff suffered the damages enumerated.

129. These actions and circumstances, pre-discovery, would, in and of themselves, warrant a reasonable fact finder in concluding that the Defendants, formed a conspiracy to deprive the Plaintiff of his Constitutionally protected rights because:

    a.  they formed a combination by which they, together, aided and abetted the commission and cover-up of unconstitutional and criminal acts of assault, and fabrication of a story, committed by the Defendant Does;

    b.  this constitutes a "conspiracy"; and

    c.  by being state actors who used their conspiracy to deprive the Plaintiff of his Constitutionally protected civil rights as described, each is liable for the harms they inflicted upon the Plaintiff as well

as the harms inflicted upon the Plaintiff by fellow co-conspirators, as a result of their concerted actions.

130. This conspiracy, as it applied to the Plaintiff herein, was an express or implied agreement between the Defendants, to deprive the Plaintiff of his Constitutional rights, *inter alia*, to be free from excessive use of force, and due process.

131. The Defendants were voluntary participants in the common venture, understood the general objectives of the plan, and knew it involved the likelihood of the deprivation of Constitutional rights, accepted those general objectives, and then agreed, either explicitly or implicitly, to do their part to further those objectives.

132. The Defendants then did each, either act, or where there was a duty to act, refrained from acting, in a manner intended to facilitate the deprivation of Plaintiff's Constitutional rights as alleged.

133. An actual deprivation of those rights did occur to the Plaintiff resulting from the said agreement or common design, and as a foreseeable consequence thereof.

134. The Defendants, and each of them, are jointly and severally responsible for the injuries caused by their fellow co-conspirators even if, or when, their

own personal acts or omissions did not proximately contribute to the injuries or other harms which resulted.

135.  As a result of the civil conspiracy entered into and acted upon by Defendants, Plaintiff suffered a deprivation of his Constitutional rights, and suffered damages as stated herein.

**WHEREFORE,** Plaintiff respectfully requests that this Honorable Court award judgment in Plaintiff's favor and against the aforesaid Defendants, jointly and severally, in an amount in excess of the One Hundred Fifty Thousand Dollar ($150,000.00) limit for arbitration in the Federal District Court for the Eastern District of Pennsylvania, together with punitive damages against Defendants in their individual capacities, injunctive relief, attorneys' fees and costs, and such other relief which the Court may find appropriate.

<u>**COUNT V**</u>
**42 U.S.C. §1983**
**Supervisory Liability-Policymaker Liability**
*Against Defendants Paris and Other PSP John/Jane Doe Supervisors*

136.  The preceding paragraphs are incorporated herein by reference as though fully set forth *et extenso* here.

137.  At all times pertinent to the claims made herein, Defendant Paris and PSP John/Jane Doe Supervisors occupied both policymaking and supervisory positions relative to the PSP and the subordinate members of its force,

concerning which all other individual Trooper Defendants were officers, members and employees.

138. Generally speaking, Paris retained ultimate responsibility and final policymaker authority over the operations of the PSP as the Commissioner of the PSP which Paris headed.

139. Defendants Paris and John/Jane Doe Supervisors implemented and/or presided over several policies, practices and customs that, in relation to the Fourth and Fourteenth Amendment claims made herein, created an unreasonable risk of Constitutional violations on the part of their subordinates, including specifically, John/Jane Does I-III; and their failure to change those policies or employ corrective practices is a direct cause of the unconstitutional conduct which was inflicted upon the Plaintiff.

140. Foundationally among these practices, was for Paris and John/Jane Doe Supervisors to ignore the obvious pattern and history of Constitutional abuses committed by the Troopers under their supervision and which bear reasonable similarities and deficiencies to those alleged herein.

141. Despite their outrageous conduct, John/Jane Does I-III, were not investigated, reprimanded, disciplined, corrected, or retrained based upon that conduct and, their past history of Constitutional deprivations likewise went unreviewed and unsanctioned.

142. In addition, this was clearly part of the existing custom and practice followed by the Supervisory Defendants which was, *inter alia*, largely to ignore Constitutionally implicated complaints about the conduct of their Troopers; to fail to properly investigate them; to fail to take corrective and disciplinary action; to allow for the cover-up of police misconduct; to adopt policies which are designed to protect Troopers from civil liability rather than to protect the citizenry from their unlawful acts; to stifle and deter citizens' complaints; and to conceal or otherwise make it extremely difficult to recover information which should be immediately available to the public concerning past PSP member misconduct, or for policy maker and supervisory review and appropriate action.

143. This deliberate indifference to the violations of citizens Constitutionally protected rights, not only reinforced the justifiable belief among the citizenry that it was useless to register complaints about police misconduct and abuse, and therefore seriously suppressed such complaints, but, it created further ill-will, retribution and even more significantly, sent a message to the members of the PSP that their violations of the community's Constitutional rights would be tolerated and go unpunished, thereby encouraging further and even more serious violations, and an

unreasonable risk of just the sort of harms that were visited upon Plaintiff as described herein.

144.   The institutionalization of a culture of constitutionally abusive members within the PSP resulted from an openly permissive approach of the PSP Supervisors to instances of *inter alia*: the use of excessive force, unlawful seizures, and incomplete and reckless criminal investigations.  This was so obvious as to be apparent to any reasonable supervisor or policymaker, including these Defendants; and, their indifference to the risks that these customs, practices, and deficient supervisory procedures obviously presented, were the moving force which resulted in the Constitutional violations suffered by the Plaintiff.

145.   This was no more true than with the Defendants' deliberate indifference to the need to provide its Troopers, including most especially, John/Jane Does I-III, with more or better training with regard to the safeguards afforded by the Fourth and Fourteenth Amendments, including particularly the prohibitions regarding unlawful seizure, excessive force, proper investigative techniques, and violations of Constitutional rights, including the right to be free from unlawful arrest and seizure detention and the right to due process, each of which is evidenced by the unconstitutional conduct described hereinbefore at length.

146. Moreover, the conduct exhibited by Defendant John/Jane Does I-III before, after, and on January 31, 2024, was not that of unexpected, independent, non-policymaking actor, but constituted deliberate and predictable acts of a subordinate who operated with a rightly perceived impunity due to the ongoing deliberate indifference of their supervisors and policymakers, including Paris and John/Jane Does Supervisors and their well-established practices, policies and customs, especially those involving vehicle stops, the development of probable cause, and confrontational contact with non-criminal citizens, which operated as the moving force behind what PSP members thought would be an overlooked and tolerated effort to engage in what had become customary Constitutional deprivations.

147. At all times pertinent to the claims made herein, Defendant Paris and John and Jane Doe Supervisors occupied both policymaking and supervisory positions relative to the PSP and the subordinate members of its force, including specifically, John Does I-III.

148. Generally speaking, Paris retained ultimate responsibility over the operations of the PSP as the Commissioner of the PSP which Paris headed.

149. In practice, Paris retained ultimate responsibility to supervise and monitor the overall operation of the PSP and was responsible to supervise and

monitor the day-to-day operations of the Department. Paris had final decision-making authority with regard to the operational conduct of the subordinate members of the force; retained the authority to measure the conduct and decisions of police subordinates; and played a required role in fashioning and implementing Departmental police policies, practices, procedures and customs. Paris is a person whose actions may fairly be said to represent the official policies and/or customs.

150. Defendants Paris and Supervisory Does implemented and/or presided over several policies and practices that created an unreasonable risk of Constitutional violations on the part of their subordinates, including specifically, John/Jane Does I-III here; and their failure to change those policies or employ corrective practices is a direct cause of the unconstitutional conduct which was inflicted upon the Plaintiff.

151. Foundationally among these practices, was for Paris and Supervisory Does to ignore the obvious pattern and history of Constitutional abuses committed by the Troopers under their supervision.

152. Defendants Paris and Supervisory Does permitted, promulgated, encouraged and/or tolerated a pattern, practice, procedure and/or custom under which Troopers of the PSP, including John/Jane Does I-III, were trained, authorized, directed, instructed and/or permitted without

intervention to conduct vehicle stops, confrontations with citizens, and seizures in such a deliberately indifferent way so as to directly cause the deprivation of the Plaintiff's Constitutional rights as stated herein, and/or recklessly create a risk thereof.

153.   The Defendant Supervisors and Policymakers either failed to promulgate necessary policies, practices and procedures, or, promulgated deficient policies, practices and procedures or, failed to enforce policies, practices and procedures which were the moving force behind the Constitutional infringements alleged herein.

154.   The Constitutional violations complained of here, were not only made possible by these failures, but were the proximate cause of the instant Constitutional violations, without which failures said violations and the Plaintiff's injuries, damages and losses would likely not have occurred.

155.   The PSP Supervisors tolerated past and ongoing misbehavior of exactly the same kind of nature as alleged *sub judice*.

156.   The PSP Supervisors were aware of a large number of incidents involving subordinate PSP Troopers who like John/Jane Does I-III were found to have been responsible for Constitutional violations precipitated by:

    i.   Unlawful seizures based upon a lack of probable cause;

    ii.   The excessive use of force; and

iii.  failures to adequately and properly use readily available investigative tools.

157.  Despite a knowledge of these past similar incidents and deficiencies, the PSP Supervisors have failed or refused to take any appropriate action to correct, remediate, or deter the persons and/or, practices, policies, procedures or customs involved, including, *inter alia*, failure to:

i.  Maintain ongoing records, including statistical (percentages) records, of the number of excessive force complaints against PSP Troopers, and the number of "founded" excessive force investigations;

ii.  Conduct systematic Supervisory reviews over excessive force complaints and investigations;

iii.  Provide necessary training and/or retraining in the areas of: the proper and improper use of force; de-escalation practices by law enforcement; proper, complete and unbiased investigations; and the proper use of investigative tools before a seizure and use of excessive force.

iv.  Performance test the aforesaid training; and

v.  Establish supervisory requirements which actively and routinely review the use of force matters to ferret out, correct, discipline or

remove, persons, customs, practices and policies which are responsible for the unacceptable outcomes which are disclosed.

158. Despite the outrageous nature of John/Jane Does I-III's acts and omissions here:

    i.  neither he/she/they, nor any Supervisor, has ever been investigated, reprimanded or disciplined for their actions or the lack of supervision exerted over them;

    ii.  their personnel file contains no adverse information about the use of force against Eggleston;

    iii.  they were not subject to new, remedial or additional training of any kind based upon their actions;

    iv.  they have never been advised that their actions were inconsistent with any policy of the PSP or that they should change their policing in any way; and

    v.  The PSP Policymakers' and Supervisors' failures to correct, remediate, deter, retrain or discipline John/Jane Does I-III's and other Troopers' prior unconstitutional misadventures has communicated approval of their PSP subordinates' behaviors leading to an ongoing custom and practice, and a culture within the PSP, which is not only deliberately indifferent to the Constitutional

violations which have resulted, but condoned, if not encouraged, the Constitutional violations and the resulting injuries, damages and losses which occurred to the Plaintiff here.

159.  These failures on the part of the Supervisory Defendants evidence their actual knowledge and acquiescence in the establishment and maintenance of a policy, practice or custom which was deliberately indifferent to the rights of persons like the Plaintiff, and which directly caused the Constitutional harms he was caused to suffer at the hands of the Supervisory Defendants and subordinate Doe troopers.

160.  The additional specific lacking supervisory practices or procedures (or policies), which the Defendants were required at a minimum to promulgate, implement, monitor and, if necessary, modify, include, *inter alia*, the following: a heightened supervisory sensitivity and vigilance for uncovering and eradicating Constitutional violations and Constitutional violators; procedures whereby members of the public who have experienced Constitutional police violations are encouraged to access a simple, convenient, non-retaliatory, and responsive procedure to register their complaints and receive prompt, objective responses; procedures carefully cataloging complaints (legal, formal and informal) and their respective outcomes – by name of both officer and complainant, the nature

of the claim, and resolution and corrective action if any; procedures for the efficient, effective, objective and independent investigation of all claims and complaints, for their analysis, and requiring the prompt and open imposition of disciplinary, corrective action or policy or procedural change; procedures for promptly responding to those who registered complaints and for securing feedback concerning the resolution reached (necessary to restore good community relations and to encourage the belief that their complaints will not be ignored); procedures requiring remedial training in Fourth and Fourteenth Amendment safeguards including especially probable cause and due process implications; procedures requiring training and remedial retraining in the Fourth and Fourteenth Amendment safeguards.

161. The existing customs within the PSP created an unreasonable risk of injury to citizens such as Plaintiff, in the absence of the above-specified supervisory policies, practices and procedures, and in this instance, were the driving force behind the Constitutional harms inflicted and, but for the absence of which, it is likely the Constitutional harms suffered by Plaintiff would not have occurred.

162. The Defendants were indifferent to these risks, given their failure to punish or otherwise remediate past conduct which resulted in adverse

consequences from those risks, and the failure to modify departmental practices, policies, General Orders, and procedures which have been brought to decision-makers' and supervisors' attention as being seriously deficient, if not unconstitutional on their face.

163.  The underlying Constitutional violations inflicted on the Plaintiff resulted from the Defendants' failure to employ the above, and other supervisory practices, or policies, and failing to train, instruct, properly test and monitor the line supervisors below them in the chain of command especially with regard to proper investigative and charging policies and the limitations the Constitution of the United States and of the Commonwealth of Pennsylvania place upon unlawful arrests and prosecutions.

164.  The Supervisory Defendants were the moving force behind the Constitutional violations of their subordinates because of their failed conduct, as described herein, which exhibited deliberate indifference to the plight of Plaintiff and all other similarly situated citizens, and their individual and collective Constitutional rights.

165.  The Supervisory Defendants' existing custom or practice, without the specific supervisory practices or procedures enunciated herein, created an unreasonable risk that persons like Plaintiff would be the victim of a

unlawful seizure and the use of excessive force violations under the circumstances presented here.

166. The Supervisory Defendants were aware that this unreasonable risk existed prior to the time of Plaintiff's Constitutional deprivations and had ample opportunity to avoid and/or eliminate same.

167. The Plaintiff's harm, injuries, damages and losses as described herein, directly resulted from the Supervisory Defendants' failure to employ the aforementioned subject supervisory practices or procedures and failure to establish and maintain the necessary and proper policies, practices and customs.

168. Accordingly, because the Supervisory Defendants established and maintained a policy, practice or custom which directly caused the Constitutional harms alleged by Plaintiff; because there existed a prior pattern of incidents similar to that which occurred here, and were condoned by the Supervisory Defendants who were deliberately indifferent to same; because they failed to adopt and/or enforce rules, regulations, policies, discipline and/or more training when the need for same was both great and obvious; and, because they acted as the persons in charge who had knowledge of, and acquiesced, in their subordinates, John/Jane Does I-III's

violations, as indicated, they are liable to Plaintiff for the damages claimed herein.

**WHEREFORE,** Plaintiff respectfully requests that this Honorable Court award judgment in Plaintiff's favor and against the PSP Supervisory Defendants, jointly and severally, in an amount in excess of the One Hundred Fifty Thousand Dollars ($150,000.00) limit for arbitration in the Federal District Court for the Eastern District of Pennsylvania.

## <u>COUNT VI</u>
### 42 U.S.C. § 1983
### Supervisory Liability – Policymaker Liability
### *Against Defendants Mayor Hagan, Chief Murtagh and Borough of Parkesburg*

169.    At all times pertinent to the claims made herein, Mayor Hagan, Chief Murtagh and the Borough of Parkesburg, occupied both policymaking and supervisory positions relative to the Borough of Parkesburg's Police Department and the subordinate members of its force, concerning which all other individual Defendants were officers, members and employees.

170.    Generally speaking, Mayor Hagan retains ultimate responsibility over the operations of the Parkesburg Borough Police Department as the executive of the Borough of Parkesburg.  Mayor Hagan shared both supervisory and policymaking responsibilities with Chief Murtagh when it came to Parkesburg Borough's Police Department, which the Chief headed.

171.   In practice, Mayor Hagan retained ultimate responsibility to supervise and monitor the overall operation of the Police Department, and Chief Murtagh was responsible to supervise and monitor the day-to-day operations of the Department.  Each had final decision-making authority with regard to the operational conduct of the subordinate members of the police force; retained the authority to measure the conduct and decisions of police subordinates; and played a required role in fashioning and implementing Departmental police policies, practices, procedures and customs, and often did so in consultation with one another.  Each is a person whose actions and inactions may fairly be said to represent official municipal policy or custom.

172.   Defendants Mayor Hagan, Chief Murtagh and the Borough implemented and/or presided over several policies and practices that created an unreasonable risk of Constitutional violations on the part of their subordinates, including specifically, the individual Defendants here; and, their failure to change those policies or employ corrective practices is a direct cause of the unconstitutional conduct which was inflicted upon the Plaintiff.

173.   Foundationally, among these practices was for Mayor Hagan, Chief Murtagh and the Borough to ignore the obvious pattern and history of

Constitutional abuses committed by the police officers under their supervision, and even preceding their tenure.

174.  The existing custom and practice followed by Defendant Mayor Hagan, Chief Murtagh and the Borough were, *inter alia*, largely to ignore Constitutionally implicated complaints about the conduct of their officers; to fail to properly investigate them; to fail to take corrective and disciplinary action, to allow for the cover-up of police misconduct; to adopt policies which are designed to protect officers and the Borough from civil liability rather than to protect the citizenry from their unlawful acts; to stifle citizens' complaints; and to conceal or otherwise make it extremely difficult to recover information which should be immediately available for policy maker and supervisory review and action;

175.  This deliberate indifference to the violations of Constitutionally protected rights, not only reinforced the justifiable belief among the citizenry that it was useless to register complaints about police misconduct and abuse, but, it created further ill-will, and even more significantly, sent a message to the members of the police force that their violations of the community's Constitutional rights would be tolerated and go unpunished, thereby encouraging further and even more serious violations, and an unreasonable

risk of just the sort of harms that were visited upon Plaintiffs as described herein.

176. The institutionalization of a culture of constitutionally abusive police misconduct within the Parkesburg Borough Police Department took a permissive approach to instances of *inter alia*: excessive use of force, which was so obvious as to be apparent to any reasonable supervisor or policymaker, including Defendants Mayor Hagan, Chief Murtagh and the Borough; and, their indifference to the risks that these customs, practices, and supervisory procedures presented, were the moving force which resulted in the Constitutional violations suffered by the Plaintiffs.

177. This was no more true than with the Defendants' deliberate indifference to the need to provide its officers, including most especially, the Defendants here, with more or better training with regard to the safeguards afforded by the Fourth and Fourteenth Amendments, including particularly the prohibitions regarding unlawful seizure and the use of excessive force.

178. Defendants Mayor Hagan, Chief Murtagh and the Borough were aware that their officers routinely confront situations that may require the use of force, including deadly force, that such situations often involve difficult decisions on the part of officers about how much force to use or whether to use force at all, and that excessive force liability will frequently result if

officers use more force than is reasonably necessary under the circumstances.

179. Defendants Mayor Hagan, Chief Murtagh and the Borough were aware of the prior incidents of the excessive use of force that had been committed by members of the Department in the past, including the Defendants *sub judice*, and failed to subject them and other offenders to appropriate evaluation, discipline and remedial training, thereby demonstrating a tolerance of past and/or ongoing police misbehavior, through knowledge and acquiescence in their subordinates' Constitutional violations; or were grossly negligent in ascertaining these facts.

180. As a direct and proximate result of the above-described policies and customs, police officers of the Borough of Parkesburg, including the individual Defendant John/Jane Does IV-VI, believed that their improper and unlawful actions would not be properly monitored by supervisory officers and that misconduct would not be investigated or sanctioned, but instead would be tolerated and covered-up.

181. Defendants Mayor Hagan, Chief Murtagh and the Borough were aware of the prior incidents of the excessive use of force that had been committed by their officers, including those involving the Defendants *sub judice*, and they failed to subject them and other officers to appropriate evaluation,

discipline, testing and remedial training, thereby demonstrating a tolerance of past and/or ongoing police misbehavior, through knowledge and acquiescence in their subordinates' Constitutional violations.

182.  Moreover, the conduct exhibited by Defendants as subordinate municipal officers and employees, which occurred on January 31, 2024, was not unexpected.  Neither was it the deed of an independent, non-policymaking actors, but constituted deliberate and predictable acts of subordinates who operated with a rightly perceived impunity due to the ongoing deliberate indifference of their Supervisors and Policymakers, including Defendants Mayor Hagan and Chief Murtagh, and their well-established practices, policies and customs, which operated as the moving force behind what the Defendants thought would be an overlooked and tolerated effort to engage in what had become customary Constitutional deprivations.

183.  The specific lacking supervisory practices or procedures (or policies), which Defendants Mayor Hagan, Chief Murtagh and the Borough were required at a minimum to promulgate, implement, monitor and, if necessary, modify, include, *inter alia,* the following: a heightened supervisory sensitivity and vigilance for uncovering and eradicating Constitutional violations and Constitutional violators; procedures whereby members of the public who have experienced Constitutional police

violations are encouraged to access a simple, convenient, non-retaliatory, and responsive procedure to register their complaints and receive prompt, objective responses; procedures carefully cataloging complaints (legal, formal and informal) and their respective outcomes – by name of officers and complainant, the nature of the claim, and resolution and corrective action if any; procedures for the efficient, effective, objective and independent investigation of all claims and complaints, for their analysis, and requiring the prompt and open imposition of disciplinary, corrective action or policy or procedural change; procedures for promptly responding to those who registered complaints and for securing feedback concerning the resolution reached (necessary to restore good community relations and to encourage the belief that their complaints will not be ignored); procedures requiring remedial training in Fourth Amendment safeguards including the use of force limitations; practices and procedures for officer conduct which places the focus of the truth-seeking process and on eliminating police misconduct rather than protecting it from prosecution, punishment or discipline; procedures for the complete statistical analysis of police complaints from whatever source, I.A. outcomes, use of force incidents, the race/ethnicity of complainants and of use of force victims, criminal charges filed, prosecutions pursued and criminal convictions

secured, etc.; procedures which permit the prompt identification and retrieval of all complaints, outcomes, and evidence, (including videos) on an individual officer basis; etc.

184.  The existing customs within the Parkesburg Borough Police Department created an unreasonable risk of injury to citizens such as Plaintiff, in the absence of the above-specified supervisory practices.

185.  Defendants Mayor Hagan, Chief Murtagh and the Borough were aware that the risks existed because they were obvious and because they had previously resulted in constitutional claims and violations by officers under their supervision.

186.  Defendants Mayor Hagan, Chief Murtagh and the Borough were deliberately indifferent to these risks, given their failure to punish or otherwise remediate past conduct which resulted in adverse consequences from those risks, and their failure to modify departmental Practices, Policies, General Orders, and Procedures which have been brought to decision-makers' and supervisors' attention as being seriously deficient, if not unconstitutional on their face.

187.  The underlying Constitutional violations inflicted on the Plaintiff resulted from Defendants Mayor Hagan, Chief Murtagh and the Borough's failure to employ the above, and other, supervisory practices, or policies, and

failing to train, instruct, properly test and monitor, and properly discipline the members of their police force, including especially the line supervisors below them in the chain of command especially with regard to proper policies and the limitations the Constitution of the United States and of the Commonwealth of Pennsylvania place upon lawful seizure and detentions.

188.  The aforesaid Defendants' conduct was intentional, willful, malicious, wanton and committed with a reckless disregard for the rights of the Plaintiff, constituting reprehensible conduct not to be tolerated in a civilized society, subjecting them not only to the imposition of compensatory damages as claimed herein, but also to punitive/exemplary damages.

189.  As a result of the deficient supervision and policymaking of the Defendants, Plaintiff suffered the damages alleged herein.

**WHEREFORE,** Plaintiff respectfully requests that this Honorable Court award judgment in Plaintiff's favor and against the aforesaid Defendants, including Doe(s) when identified, jointly and severally, in an amount in excess of the One Hundred Fifty Thousand Dollar ($150,000.00) limit for arbitration in the Federal District Court for the Eastern District of Pennsylvania, together with punitive damages against Defendants in their individual capacities, injunctive relief, attorneys' fees and costs, and such other relief which the Court may find appropriate.

## **COUNT VII**
**42 U.S.C. §1983**
**Municipal Liability**
***Against Borough of Parkesburg***

190. The preceding paragraphs are incorporated herein by reference as though fully set forth.

191. Prior to January 31, 2024, the Defendant Borough of Parkesburg either failed to develop proper policies or, developed and maintained policies and/or customs exhibiting deliberate indifference to the Constitutional rights of persons in Parkesburg, which caused the aforesaid violations of Plaintiff's Constitutional rights.

192. The violations of Plaintiff's Constitutional rights under the Fourth and Fourteenth Amendments to the United States Constitution, Plaintiff's damages, and the conduct of the individual Defendants were directly and proximately caused by the actions and/or inactions of Defendant Borough of Parkesburg, which has encouraged, tolerated, ratified, and has been deliberately indifferent to, *inter alia*, the following policies, patterns, practices, and customs, and to the need for more or different training, testing, enforcement, supervision, investigation, or discipline in the areas of:

    a. the use of force by police officers;

b.  the proper exercise of police powers, including but not limited to, the detaining of members of the public, proper seizures, and the use of force;

c.  the monitoring of officers whom it knew or should have known were suffering from implicit bias that impaired their ability to function as officers;

d.  identifying and remediating, and/or disciplining police officers who were the subject of prior civilian or internal complaints of misconduct, as well as those officers who do not investigate and/or review conduct of those officers in an objective, independent and accurate way;

e.  police officers' use of their status as police officers to intimidate citizens and to employ the unreasonable use of force or to achieve ends not reasonably related to their police duties; and

f.  the proper sanctioning or disciplining of officers who are aware of and conceal, and/or aid and abet, violations of Constitutional rights of citizens by other Parkesburg Borough Police Officers including by way of biased false and/or incomplete reporting, and or investigating.

193. It was also the policy and/or custom of the Defendant Borough of Parkesburg to fail to identify and report, and to adequately and properly investigate police misconduct; including citizen and internal complaints of police misconduct, and acts of misconduct were instead tolerated and/or justified by the Borough of Parkesburg, including, but not limited to, complaints of citizens.

194. It was also the policy and/or custom of the Defendant Borough of Parkesburg to inadequately screen and test during the hiring process (including psychological and drug screening) and to fail to intermittently test thereafter, and to inadequately train and supervise its police officers, including Defendant John/Jane Does IV-VI, thereby failing to adequately discourage further Constitutional violations on the part of its police force in general, and Defendant John/Jane Does IV-VI in particular.

195. The Defendant Borough of Parkesburg did not require or demand appropriate in-service training or re-training of officers who were known to have exhibited intemperance, lack of self-discipline, lack of integrity, lack of judgment, implicit bias or who were known to have engaged in police misconduct, excessive use of force, or who were known to encourage or tolerate same.

196. In fact, no supervisory officer of any rank, in any department of the Parkesburg Borough Police Department, ever came to a training officer or director and recommended any changes in the officer training to prevent the type of Constitutional violations which occurred here, including the excessive use of force, even though excessive force claims, in various forms, were numerous for such a small force of officers.

197. As Plaintiff has stated hereinbefore, there exists a pattern of similar Constitutional deprivations by untrained employees in the past such that the Borough is put on notice that additional or different training is necessary to avoid Constitutional deprivations such as occurred here, but neither the Defendant Borough, its Defendant Mayor, nor its Defendant Police Chief took any action upon same.

198. Even if discovery should produce further evidence of the aforesaid pattern of recurring deprivations or injuries which would place the Borough on notice, this incident, in isolation, would be sufficient to establish the Borough's failure to train because the need for more or different training in the areas of conducting proper investigations, writing trustworthy reports, employing proper and safe means and methods of dealing with incidents use as a limited and specialized tool for stopping only a certain class of suspects, was so obvious.

199. The violation of the Plaintiff's federal rights, in the manner in which it occurred here, was a highly predictable consequence of the Borough's failure to train in these areas.

200. The Defendant Borough of Parkesburg also did not adopt needed policies, which should have been intended and calculated to avoid the Constitutional violations referred to herein.

201. The lacking practices, procedures, General Orders and/or policies, which Defendant Borough of Parkesburg was required at a minimum to promulgate, implement, monitor and, if necessary, modify, include, *inter alia*, the following: a heightened supervisory sensitivity and vigilance for uncovering and eradicating Constitutional violations and Constitutional violators; procedures whereby members of the public who have experienced Constitutional police violations are encouraged to access a simple, convenient, non-retaliatory, and responsive procedure to register their complaints and receive prompt, objective responses so that the present public complaint system, which seriously under-reports complaints (including especially those concerning excessive use of force), can properly reflect actual complaints received; procedures carefully cataloging complaints (legal, formal and informal) and their respective outcomes – by name of both officer and complainant, the nature of the

claim, and resolution and corrective action if any; procedures for the efficient, effective, objective and independent investigation of all claims and complaints, for their analysis, and requiring the prompt and open imposition of disciplinary, corrective action or policy or procedural change; procedures for promptly responding to those who registered complaints and for securing feedback concerning the resolution reached (necessary to restore good community relations and to encourage the belief that their complaints will not be ignored); procedures requiring remedial training in Fourth Amendment safeguards including use of force limitations; procedures requiring training and remedial retraining in seizure procedures; practices and procedures for officer conduct which places the focus of the truth-seeking process and on eliminating police misconduct rather than protecting it from prosecution, punishment or discipline; procedures for the complete statistical analysis of police investigative results, including complaints from whatever source – including internal, I.A. outcomes, use of force incidents, the race/ethnicity of complainants and of use of force victims; procedures which permit the prompt identification and retrieval of all complaints, outcomes, and evidence, (including videos) on an individual officer basis; performance based testing and decision making; procedures requiring decision-making,

in the field, and strict requirements for the deployment of dash cameras and body cameras with actual disciplinary consequences.

202. The existing customs referred to herein as being extant within the Parkesburg Borough Police Department, created an unreasonable risk of injury to citizens like the Plaintiff in the absence of the above-specified rules, regulations, General Orders, practices and procedures.

203. The Borough of Parkesburg's policy makers were aware that these risks existed because they were obvious and because these risks had resulted in repeated Constitutional harms, which had occurred previously under their supervision, and which had also resulted in civil rights litigation and the payment of substantial verdicts and settlements under their supervision.

204. The Borough of Parkesburg's policy makers were indifferent to these risks, given their failure to eliminate or remediate those responsible for the past unconstitutional consequences of said risks, and their failure to modify departmental practices, policies, General Orders, and procedures which have been brought to their attention (including by many experts, and the courts, as referenced earlier) as being seriously deficient, if not unconstitutional on their face, and clearly unconstitutional in practice.

205. It was the policy and/or custom of the Defendant Borough of Parkesburg to allow and even promote the excessive use of force by its officers, as well

as the commission of the other Constitutional violations described herein, including the cover-up of such acts and/or omissions.

206. In spite of numerous and various excessive force complaints made against the Parkesburg Borough Police Department relating to arrests and physical contact with citizens, the Borough and its police department have never proposed any appropriate changes to the Parkesburg Borough Police Department's Use of Force Policy to curb excessive use of force, or other misconduct.

207. As a result of the above described policies and customs and failure to enforce and/or adopt necessary and appropriate policies, police officers of the Defendant Borough of Parkesburg, including the Defendants, believed that their actions would not be properly monitored by supervisory officers or the Borough, and reasonably believed that their misconduct would not be investigated or sanctioned, but would be tolerated and even encouraged.

208. As stated hereinbefore, the promulgation of general orders, policies, or practices which are ignored as a matter of custom and/or practice, or which are directed at creating potential defenses for officers' unconstitutional acts, including the assaultive and conspiratorial acts alleged herein, rather than general orders, policies or practices which are directed at identifying, punishing and eliminating those unconstitutional acts, and which ignore

the Constitutional protections guaranteed to all citizens, constitutes irrefutable evidence of the Borough's, its Chief's, its supervisor's and decision-maker's, deliberate indifference to those rights.

209. The above described deficient policies, customs, and training, and the failure to enforce, modify, terminate and/or adopt necessary and appropriate policies, practices, procedures, training and General Orders, demonstrates a deliberate indifference on the part of the policymakers of Defendant Borough of Parkesburg, which has continued to serve as the moving force behind, and the cause of, the violations of the Plaintiff's rights as alleged herein, as well as the claimed damages which resulted therefrom.

210. Failing historically to require independent, objective and accurate investigative reviews of officers' misconduct, as evidenced once again by the above-referenced deliberate indifference to same, sends the message to all members of the Parkesburg Borough Police Department that their misconduct will not be seriously reviewed or disciplined, thereby condoning, if not encouraging, future misconduct which would be expected to be met with the same deliberate indifference and resulting impunity.

211.   But for the continuing deliberate indifference which manifest itself as described above, the injuries, which were suffered by the Plaintiff, would, in all likelihood, not have occurred.

**WHEREFORE,** Plaintiff respectfully requests that this Honorable Court award judgment in Plaintiff's favor and against the Defendant Borough of Parkesburg, in an amount in excess of the One Hundred Fifty Thousand Dollar ($150,000.00) limit for arbitration in the Federal District Court for the Eastern District of Pennsylvania, together with injunctive relief, attorneys' fees and costs, and such other relief which the Court may find appropriate.

## COUNT VIII
### State Assault and Battery
### *Against All Individual Defendant Does*

212.   The preceding paragraphs are incorporated herein by reference as though fully set forth.

213.   Defendants intentionally assaulted and battered Plaintiff as stated hereinbefore.

214.   Defendants' conduct was intentional, willful, malicious, wanton and committed with a reckless disregard for the rights of the Plaintiff, constituting reprehensible conduct not to be tolerated in a civilized society, subjecting him not only to the imposition of compensatory damages as claimed herein, but also to punitive/exemplary damages.

215. As a result of Defendants' assault and battery, Plaintiff suffered the damages stated herein.

**WHEREFORE,** Plaintiff respectfully requests that this Honorable Court award judgment in Plaintiff's favor and against the aforesaid Defendants, jointly and severally, in an amount in excess of the One Hundred Fifty Thousand Dollar ($150,000.00) limit for arbitration in the Federal District Court for the Eastern District of Pennsylvania, together with punitive damages against Defendants in their individual capacities, injunctive relief, attorneys' fees and costs, and such other relief which the Court may find appropriate.

## COUNT IX
### State Civil Conspiracy
### *Against All Individual Defendant Does*

216. The preceding paragraphs are incorporated herein by reference as though fully set forth.

217. The referenced Defendants conspired to engage in the willful, wanton, malicious and tortious state claims alleged herein, whereby each Defendant acted in concert, pursuant to an agreement, to cause the stated harms or in some way facilitated the conspiratorial objective of inflicting the resulting harms, upon the Plaintiff, by their own acts or omissions or by those of fellow co-conspirators.

218. As a result of the aforesaid conspiracy engaged in by Defendants, Plaintiff suffered the damages stated herein.

**WHEREFORE,** Plaintiff respectfully requests that this Honorable Court award judgment in Plaintiff's favor and against the aforesaid Defendants, jointly and severally, in an amount in excess of the One Hundred Fifty Thousand Dollar ($150,000.00) limit for arbitration in the Federal District Court for the Eastern District of Pennsylvania, together with punitive damages against Defendants in their individual capacities, injunctive relief, attorneys' fees and costs, and such other relief which the Court may find appropriate.

## OTHER

219. Plaintiff respectfully requests a jury to deliberate upon the within causes of action.

220. The within case is not subject to arbitration.

221. Where permitted, the Plaintiff demands reasonable legal fees, costs, interest, expenses, delay damages, compensatory damages, punitive damages and any other damages deemed appropriate by the Court.

222. Plaintiff requests that this Honorable Court issue declaratory and injunctive relief, as appropriate, declaring the within described practices to be unlawful, and enjoining their present and continued future employment and effects.

**WHEREFORE,** Plaintiff respectfully requests that this Honorable Court for each Count alleged:

a. Award compensatory damages to Plaintiff against the Defendants, jointly and severally, in an amount in excess of $150,000.00 exclusive of interest and costs in each of the foregoing Counts;

b. Award punitive damages to Plaintiff against the individual Defendants, in their individual capacities, jointly and severally, in an amount in excess of $150,000.00 exclusive of interest and costs in each of the foregoing Counts;

c. Award reasonable attorney's fees and costs to the Plaintiff, as may be awardable pursuant to 42 U.S.C. Section 1988 of the Civil Rights Attorney's Fees Award Act of 1976, or any other appropriate statutory provision(s);

d. Enter an Order enjoining Defendants from engaging in the future in the conduct identified in the Complaint as violative of 42 U.S.C. §§ 1983, the 4th and 14th Amendments of the Constitution of the United States, and Article I, Section 1, Article I, Section 8, and Article I, Section 9 of the Pennsylvania Constitution; and further affirmatively requiring the Parkesburg Borough Police Department to engage in appropriate remedial efforts to adopt, and enforce, policies for the Parkesburg

Borough Police Department that are calculated and intended to preclude the conduct alleged to have been engaged in by the Defendants named herein and, providing for the independent monitoring of same; and

e.  Award such other and further relief, as this Court may deem appropriate.

Respectfully Submitted:

Dated: January 16, 2025        By: _Robert E. Goldman_____

Robert E. Goldman, Esquire
PA Attorney I.D. # 25340
535 Hamilton Street, Suite 302
Allentown, PA 18101
(610) 841-3876
reg@bobgoldmanlaw.com
Attorney for Plaintiff Wesley Lee Eggleston, II


Dated: January 16, 2026        By:   /s/ *Gerard P. Egan*_____

Gerard P. Egan, Esquire
PA Attorney I.D. # 20744
657 Exton Commons
Exton, PA 19341
(610) 567-3436
gpelaw513@gmail.com
Attorney for Plaintiff Wesley Lee Eggleston, II